This is 4-13-0284, in re the marriage of Cheryl and Daryl Dunahee. Attorney Donald is here on behalf of the appellant. And Attorney Boland is here on behalf of the appellee. Ms. Donald, you may proceed. Good afternoon. I've never argued in front of you before. I'm Kim Donald. It's nice to meet you. Cheryl and Daryl were married. It's hard for me to keep saying Cheryl and Daryl. But Cheryl and Daryl were married for 28 years. During that time, the parties had two children. Cheryl was the primary caretaker of the children. It was the party's decision for her to stay home and keep the house and help Daryl with the farming. She also did books for the farm. The couple was able to build Dunahee Farms into a very successful farming operation. In fact, at trial, I think it was on cross, but I'm sure he would have admitted it on direct, Daryl admitted that partly due to Cheryl, he is the success that he is today. The party's tax return also indicated that they're successful. For the last three years, with 2011 being the last one, 2011 they made $189,000. 2010 they made $111,000. And 2009 it was $111,000 also, and that was the adjusted gross income. And considering this case, my complaints are, I guess my biggest complaint would be the maintenance, the amount of the maintenance and the duration of the maintenance. And I ask you, in considering that, to compare the individuals, to compare Daryl to Cheryl. Daryl is a successful farmer, talented guy. Daryl has a pilot's license, a half her life, and although he's not making any money with it now, possesses the ability should things change, and has made money with it in the past. Daryl also works as a seed company representative. Daryl also custom farms. Lastly, in my description of Daryl, it's important to note that he has inherited property, non-marital property, not just inherited, non-marital property valued at $1.2 million. This is property that is not Cheryl's. Cheryl has no non-marital property. So in addition to having a multiple skills, a successful farming operation, he has $1.2 million. Excuse me, counselor, you said he custom farms. I thought he had his own farm ground and farmed for himself. He does farm for himself, but he also occasionally does. And he custom farms. Yeah. Okay. It's something he does, I guess, when he has the time to do it, and he has the ability to do it. He also has the ability to do it. I just want to make sure it's clear. And I think he did it, when his dad was alive, I think he did it more. Cheryl, on the other hand, has stayed at home for the last 28 years. She's never had to worry about paying bills. She's always lived in a rural community where basically you can't even see the neighbors. It embarrasses me to say it in front of Cheryl, but Cheryl has no marketable skills. She has devoted herself half her life to her husband, her children, and the farm. Did the trial court explain how he determined Cheryl was to rehabilitate herself? No. The trial court did not determine how Cheryl was to rehabilitate herself. I believe, reading between the lines, that the four years and the $500, that after that, perhaps she could draw Social Security and live on that. But there was no plan. On the subject of rehabilitation, she hasn't been in school since the 1970s. And those of you who have children in school or grandchildren in school, nieces and nephews in school, you know that school learning is a lot different than it was in the 1970s. With the technology, it's just completely different. And for Cheryl to apply to a four-year college or a two-year college and start her life over at, I mean, she was 57 at the time, she's 60 now, just doesn't make sense. So as I said, my first claim of error was maintenance. Obviously, Judge Pacey found that under the statute, she was entitled to maintenance. That's why he gave her the $500 for a month for four years. Before we leave the Social Security thought, was there evidence in the record as to what her Social Security benefit might be? No, sir, there was not. And would I assume that whatever benefit that was would be derived from her husband's benefit? From her husband, yes, because she doesn't have enough hours paid in to receive it. I had one other question for you before you go on. I thought you said in 2009 the adjusted gross income was $111,000. Is that what you said? I believe I said that if I went back. I had $189,848, $111,968, and $111,001. Going back from 2011. Right. So again, he found that she deserved maintenance, but then she's been completely relying on Daryl for 28 years. And after such a long marriage of four years, which is one-seventh I think, it's shocking. And I guess the case I rely on the strongest, which is also a Fourth District case that was decided in 2004, is the Selinger case. And the Selinger case that this court, the Fourth District, reversed that. And in that, it wasn't a farm case, but it was a husband, I believe he was an engineer here, substantially more than the wife. And the court awarded the wife 10 years of maintenance at $400 a month. So basically she got $48,000. And she was in a different position than Cheryl. And assessing the reasonableness of the award, the court needed to look at the potential for future earnings of the lower-wage earner. And with this, I ask you to compare Mrs. Selinger with Mrs. Dunahee. Mrs. Selinger was 45 years old. Mrs. Dunahee, at the time of the dissolution, was 57. Mrs. Selinger had a nursing degree. Again, Cheryl has no degrees. Mrs. Selinger's maintenance total is $48,000. Mrs. Dunahee's maintenance total is $24,000. Mrs. Selinger is, as I said, 45. Cheryl is 57. And although Mr. Selinger also earned in the lower six figures, there's no evidence that he had $1.2 million in non-marital assets. Additionally, Mrs. Selinger was employed. She was employed as a nurse. And she was receiving child support also. And Mrs. Dunahee is unemployed. How much maintenance did you ask for in the trial court? I was trying to remember.  A month. A month. What did you base that on? Cheryl's expenses and her needs and what I thought she needed to continue her life commensurate with standard of living. Did you take into consideration what she received in the property settlement? I did. And I'll jump in her mouth a little bit. But she immediately, with the property settlement, bought a house. So that took away some of her property settlement. She couldn't qualify for a mortgage on a house. So a lot of the liquid assets were gone. And then as far as the property settlement, at some point, I think both these people were retired, so a lot of them weren't liquid assets. So she needs that for way down the road. And so as far as liquid assets, she gets what Darryl pays her for rent on Dunahee South and then the $500. She's also paying her own health insurance. To go back to Selinger, they use the language where a spouse is not employable or unemployable, only at a low income. Indefinite maintenance is appropriate. And I kind of see that here. And under circumstances involving spouses with grossly disparate earning capacity, the goal of financial independence is not always achievable. And here, I just don't see the goal of financial independence ever being achievable. So I say that the maintenance was an abuse of discretion. I don't know how she's going to rehabilitate herself. I mean, I think she would only qualify for working in a store at a minimum wage job or maybe cleaning other people's houses. Basically, that's all she has. And the job market, particularly in Illinois, even for those jobs, is very, very, very, very tight. And I really feel that the judge abused his discretion. And I don't know why he did it, but I feel he did because we're asking for maintenance. He decides to give Cheryl what I characterize as a paltry. Somebody still gives Cheryl maintenance. But then in the next breath, in one hand, he gives her maintenance. But then with the other hand, he requires her to pay for a third of their daughter Kayla's college education. I wasn't clear how much that amounts to. I thought there was something in the record to show that most of it had been paid for. Most of it had been paid. So what is the one third that is left? It turns out to be one semester. Oh.  So it turns out to be two semesters. Two semesters. And again, you know why it's not in the record, I will say, is because it really threw me for a loop. Because Darryl testified. He testified, I want to pay Kayla's tuition. I'm going to pay Kayla's tuition. I fully intend to pay Kayla's tuition. I noticed that in the brief, but I could not find that in the record where he said that. And it is in the record. I know I specifically asked. You know it's in there. I couldn't find it. Where is it then? I didn't mark it because I didn't realize you couldn't find it. I'll flip through it, and then when I give my rebuttal, I'll say page 32. OK. Great. Otherwise, move on. All right. The other point I have to make about that is part of their agreement, as you see, the divorce was fairly amicable. And in their agreement, Cheryl allowed him to keep the whole farm. She didn't have to rent it to her, but he's allowed to keep farming the same number of acres he can, which really allows him to pay for it. She allowed him to cash rent. Was it a fair cash rent? Fair cash rent. Sorry, was it the same that she would have got if she cashed rent to somebody else? To somebody else, yeah. But she could have sold the property. She still could, couldn't she? I mean, the ground is sold pursuant to cash rent. Well, she's under an agreement. Well, the purchaser would assume the same cash rent. So she could do that. But I guess my point is that was, I believe, implied to be part of the agreement to keep the farm together so he could keep that expense. But you're right, I do think $200 is fair cash rent. $250, I think. $250. $250. And again, on the subject of the college expenses, I need to point out again that Darryl does have the $1.2 million in non-marital assets. And some of the, as you know, statutorily, as far as the property division, we have problems with the property division. Again, a lot of the factors on the division of property are the same as the factors for maintenance, which go in Cheryl's corner, the length of the marriage. And she helped on both farms. And it was our position that given his $1.2 million is a lot of money, and Cheryl doesn't have that, given that he had that, we were looking towards a disproportionate share. I note that Judge Pacey gave us an extra $34,000 and it wasn't quite clear where that came from. $1.2 million compared to $34,000 just doesn't make any sense. And then some other points about property division. During the trial, while they were separated, Cheryl received $69,000. That was characterized as an advance. I objected to that characterization, but anyway, she did get $69,000. I'm not saying that. But his AGI that year was $189,000. And we had asked that the remaining $120,000 be divided. And I thought that that was ignored by the trial court. Did you say AGI? Adjusted grossing. Oh, adjusted grossing. I thought that that amount was ignored by the trial court. Just nothing was done. Nothing was put out. When we were dividing things and trying to make things equitable, nothing was put on his ledger side for that. Let's assume for the moment that your client either is not employed or is employed perhaps in a minimum wage job. Does the record show that her only income will be cash rent and maintenance? Yes. And then there is a modest amount of investments, but a fourth of that is in an IRA, as I look at it. I know Mr. Boland suggested that she could invest at 5%. I think that's slightly unrealistic. I guess maybe other people know things I don't. But anyway. Well, I assume the country financial investments are invested and have a return. Yes. And Edward Jones has a return. Yes. But we don't know what those amounts are at the moment. No. And they would not be particularly significant. Her expenses, would they be ordinary household expenses? Ordinary household. Plus real estate taxes and medical expenses. Yes. And then she operates a vehicle. Yes. Her health insurance, which given her age. In response to your request for maintenance, did your opponent suggest there be no maintenance or a lower amount or what? I believe they suggested no maintenance given the property. And lastly, when giving back the inherited funds, Daryl could trace his inherited funds that purchased done in the South. And that was $80,000. And we don't contest that. But again, when the ledger was done, which Judge Pacey accepted, they subtracted $40,000 from Cheryl and $40,000 from Daryl. Cheryl got done in the South. So in a sense, she gets dinged at $80,000 on it. And my last point is that for whatever reason, Daryl didn't turn in a financial affidavit. There was a lot of discovery in this case, but there was not a financial affidavit. So it was strange to me that Judge Pacey was able to set maintenance without a financial affidavit. And there were crops in the ground in 2011 that were sold in 2012. And our information about that was sparse, although we had subpoenas and depositions. When asked about it at trial, Daryl indicated he had no idea. Later, when we subpoenaed the grain elevator, I believe it was 318 for crops that had been in the ground in 2011 and sold in 2012. And lastly, we had asked for reimbursement of prepaid expenses, which 6203.39 was the prepaid expenses. And Judge Pacey said, well, that's going to help her. But they were crop sharing. They were cash renting. So that comment didn't make sense. Or maybe it made sense and I didn't understand it. When you said 318, you mean $318,000? $318,000. Worth of crops. Yes. Thank you. Thank you. Mr. Bowen? Your Honors, Counsel, I am Chris Bowen, and I'm here on behalf of Daryl Dunahee. Mr. Bowen, can I just ask a question before you get started? Do you agree that the 2009 adjusted gross income was around $111,000? I honestly don't have that in front of me. I can't disagree and I can't agree. I apologize. The income tax returns are part of the record all the way back to 2000, and I believe seven or eight. I know I cited the income for 2008 in my brief. I'm talking about 2009. Good question. I think I did cite it. I think it is $111,000. Can I have just a second and I will answer that question? I apologize. 2009 would have been $111,000 roughly. 2010 was $111,000. 2011 was $189,000. And I argue in the brief why that's a substantial aberration dealing with roughly $70,000 that was distributed to her that was not available to spend on expenses in the farm because Daryl, as the trial court noted, Daryl operated his farm not from an operating loan but by prepaying expenses for the following year from this year's income. Our position, Your Honor, obviously, is that this is a matter that is in the trial court's discretion. It's not a matter as to whether Cheryl or Mrs. Dunahee agrees with the court or whether, quite frankly, this court agrees with the trial court, but whether no reasonable person would come to the same decision as the trial court did. The trial court in this case gave a written memorandum regarding explaining his decision and gave a further written memorandum in response to the motion for reconsideration. The first argument raised by the appellant in this case is the issue that there was an unfair distribution of property. In fact, of the marital property in this case, the appellant received more than 50%, not substantially more, but more than 50% of the marital property, of the marital assets. She also received almost all of the cash assets of the parties, and she received not any debt from the parties' assets. On the converse side, my client received his share of the marital assets but assumed a substantial amount of debt. And that's noted by the court, and it's argued by me because from a cash flow standpoint, it has a significant effect on his ability to pay maintenance and on his ability to maintain the ongoing nature of the farm business itself. As we cite in our brief, he is required under the court order to pay approximately $62,000 for either debt, maintenance, or lease payments to satisfy the judgment order. Further, it's ironic that we're here arguing about the division of assets because most of the, at least the real estate assets, were agreed upon. That means she was to get 80 acres, he was to get 80 acres, he agreed to assume the debt that existed on her 80 acres and have it transferred to his 80 acres, he was to receive the homestead and pay her half of the agreed appraised value of the homestead. So there was not a substantial issue in court, and she was agreed to the cash rent lease, which everybody acknowledged at the time was a fair cash rent for the property involved. What was the value of your client's non-marital estate? It's approximately $1.1 million in other farmland that he farms. And you would agree that it's a consideration of the court in making a distribution of property? The court can consider that in making a distribution. I cited the Steele case, which is a 5th district case in my brief, and I would cite it again, wherein that court found that it was not a basis to disturb the division of property, which in that case is 50%, even though the other one party received substantial non-marital assets. And I think that's the case here. The fact is that because somebody gets non-marital assets, the statute doesn't say, well, then you have to equalize all of the assets, as it seems that they're arguing. Well, it says you're supposed to consider it. Absolutely. If you just divide the non-marital, I mean the marital 50-50, then how did you really consider it? Well, you consider it because also when you divided the marital assets, he has assumed the debt of paying her $225,000 in cash, plus assuming the mortgage on the 80 acres. She has no debt. In order to accomplish paying the debt from the farm operations, and the non-marital property was part of the farm operations, assuming there is $111,000 in adjusted gross income, $62,000 has got to go out the door in terms of payments to make payments pursuant to this judgment that would never have been spent but for this judgment. So in order to accomplish what he has to accomplish to satisfy the judgment and to make her whole on her half of the marital assets, that's the only way it's going to work. And I think the court considered that, and the court mentioned that he considers the fact that he has assumed or is assuming substantial debt to pay off her assets that she's receiving. What is that $62,000? What does that represent? It represents roughly $19,000 to pay the debt for the $225,000, roughly $19,000 to pay for the debt of the mortgage, which is roughly $220,000. The extra mortgage that he's assuming. Correct. Correct. It assumes the $6,000 that he's paying in maintenance, and it assumes the $20,000 that he's paying in cash rent for the farm that he's cash renting from her. Because recall, before the division of property, there would have been no cash rent, no maintenance, and none of these. But I assume that that cash rent is not being given as a favor. The ground is going to be farmed, and it's going to have income. Sure. Absolutely. But it's a fair cash rent. The green is a fair cash rent. Right. So it's not a matter that it's all windfall to him and no money to her. No, but it's not the same kind of outgo as repaying debt. It's an ongoing business expense. Absolutely. Just as if he was doing it with somebody else. But it's a new business expense that he didn't have before the divorce, and he now has assumed because of the court's judgment. Our position is that the court's decision is based on sound discretion, as the court has fully explained its position, and that it would be impossible to say that no other reasonable person would find the same facts of the same case that was before the trial court. Do you think that there are very many near-senior citizen individuals living on somewhere between $20,000 and $30,000 a year? Sure. The answer to that is yes. There are lots of senior citizens living on $20,000 to $30,000 a year. And would we hope that most of them would be living in better circumstances than that? I would hope everybody is living in the best possible circumstances. You're very generous. I guess what I'm saying is someone who's come from, and I'm not talking about a lavish lifestyle or anything like that, but somebody who's come from a family that has built itself up and has been able to enjoy the benefits of labor, the labor that a lot of it from your client, some from his ex-wife, $20,000 from cash rent and $6,000 from maintenance, and maybe another $3,000, $4,000, $5,000 a year in investment income, maybe, even though one thinks that might go toward retirement. Of course, the sale of the farm in the future could result in retirement as well. It just seems like it's above poverty level, but not a hell of a lot. These parties were not lavish. No, I didn't mean that they were. They had a very, very moderate lifestyle when they were living together. They didn't vacation except for a weekend camping trip. They didn't buy new cars. Mr. Dunn, he's farmed machinery. If you look at the depreciation schedule, it's almost all depreciated out. He's going to have to be replaced because he's going to have to farm for 20 years. But at these parties, she shopped at, she knows she shopped at Kmart and Penny's, and that's how they lived. They didn't go out to eat. These parties lived a very moderate lifestyle. I'm not trying to criticize that, but in the year of the separation, she spent her year looking for a house, a new house on a lake or a pond in the country. There's no evidence whatsoever regarding her employability because she made no efforts whatsoever to see if she was employable. Now, I understand you can, I'm not asking you to ignore, put aside your common sense, but the fact is that for her to come now and say, well, I'm not employable, to this day, as far as we know, there's never been an attempt to become employable. Yet she has a house that's fully paid for, according to her. That was what she intended to do with $215,000 of the $225,000. According to her, her expenses were $3,300 a month. That was the affidavit she filed. We've gone through that in the brief as to how that money can be accomplished, and the trial court suggested that based upon living or finding some employment, that that would more than accommodate her needs, which is the standard, I would argue, in awarding the amount of maintenance to be awarded. So based upon that... The maintenance is not going to last until she can draw full benefits from Social Security. It would last until she's 62. Well, nobody's going to tell us to take our Social Security at 62 unless it's absolutely have to. Would you agree with that? Well, I don't think... If you're going to live a while, you're really bumping yourself if you do that. Well, there are some financial advisors, and this is way beyond the record and way beyond this case, that would argue that you should take it at 62 because you'll never get the full benefit of it based upon your present life. But I understand the court's, what you're saying. My position is that until she attempts to obtain employment of some kind, I don't believe Mr. Dunhee is going to have to be working for a long period of time to come. I don't think that that means that she can live with no employment and no effort other than living in her new house on the lake. I think that's not reasonable under the circumstances. And he's going to have to be working because he's got a lot of debt that is assumed that he's going to have to pay off. Mr. Boland, did your client testify during the trial that he was willing to pay the college expenses of the child? I don't think he testified to that. I think in my final argument, I offered that, to be candid. Because Judge Pacey's order refers to testimony. I honestly don't remember, and I'm not evading you, I really genuinely don't remember, but I do know that I offered to pay that debt, or that expense, during the course of the trial, or in my final brief. Well, why didn't he take you up on that? I don't know. He said because he found that each of them, that she had paid $3,000 during the course of the year that she was separated, that he felt that each of them could then pay one-third of the college expenses. Let me ask you this, will you offer that same concession to this court? Not without any return concession offered from the other side. What was the return concession you asked from Judge Pacey? Well, we suggested a limited amount of maintenance, meaning no maintenance. That's what our argument was, because of our commission of property. Are you suggesting that $500 isn't a fairly limited amount of maintenance? It's only $6,000 a year. Well, that's still $500 a month that Mr. Dunne has to work and earn in order to pay. So, I'm not going to characterize it, the court adds, I mean you have and I certainly respect that characterization, but I'm not going to minimize the fact that somebody has to earn that money and pay it, either. And I'm not going to minimize it. He'll make more than that off of that ground he's cash-renting for $250 an acre from her, won't he? We hope so. We hope so. Probably will. But at $3.97 a quart, he won't. I think it's up to $4.05. Okay. I heard $3.97 this morning. That's why I was reacting to that. What about the $318,000? That's not a true statement, and that's not in the record. Mr. Dunne, he acknowledged he had $115,000, and it's mentioned by the court, of the grain in storage, and it's awarded to him by the court, and I believe the value was $115,000. Is that reflected in the court's? Yes, it is. If you look at the court's award, there's grain in storage of $115,200. All right, I'll look for it. So I think that was the amount that was testified to, and I think that's the amount that was awarded to him as part of his equal share of the property. I don't know where this other number came from. I don't think that's anywhere in this record. It is true. They have subpoenaed all of the elevators in the area, all of the banks in the area. They've taken his deposition. They had his statement of assets. We've gone through all of it. We've had full discussions about assets. He was asked regarding some of the grain that he had sold during the year. He answered that in the record. But I don't know of any place that said $316,000 of grain anywhere. I don't know where that is. That's certainly not in any record that I remember. So our position, Your Honors, is trial court made a decision in this case. It divided property. It divided it in accordance with the statute, and it divided it so that she received more than half of the marital assets. Counsel, going back to the college expenses, you conceded at the trial level one-third. Well, what does the one-third mean? You must have had some monetary value you were associating with that argument you made to the trial judge. Otherwise, you wouldn't have said that or conceded that. My position was whatever it was, we would take that on as an obligation. There were four semesters that Kayla had left to go to an ISU. That's where she was beginning her education. She moved on from Parkland and went to Illinois State. We assume that there's tuition. We assume that there's room and board, the normal expenses. And that's what my client was assuming. And quite frankly, the answer to your question, yeah, he would assume that. He wants his daughter to get an education. If the award requiring her to pay $3,000 means they have to fight over that, his position is Kayla's got to be educated. So in fairness to you, I ducked your question before I tried to bargain with you and I apologize. No, I kind of invited that. You, a few moments ago, said common sense. Well, let's look at this from a common sense standpoint with regard to whether the maintenance should be permanent. She is, at the time of disillusion, 57 or 58, correct? Right. They'd been married 28 years. She'd stayed home with the family. She had basically no work experience. And she had no education other than a high school education, as I understand it. How could the trial court limit the maintenance to four years under the theory that she could in some way rehabilitate herself? Well, I think the trial court is looking at the fact that in the years since she separated, there was no effort of any kind to do anything to rehabilitate herself. I believe that's probably – I think the trial court mentions that in its findings. The fact is that since – during that time and since then, to our knowledge, there's been no effort to do that, and that's the money she has received is what she has received. Four years and then – it could have been permanent, but reviewed in four years. I understand. Or two years. There are a wide variety of options that in my long time of trying divorce cases I have seen and sometimes got my back in the air over and sometimes said, ah, that's a reasonable approach. I think in this case, under the circumstances with the amount of assets that she's receiving and the potential use of those assets, that there is sufficient funds for her to maintain herself in the standard of living that the parties maintain during the course of their marriage. And that's why I would argue that there is no abuse of discretion here. Okay. Thank you. I appreciate your time. Thank you, Mr. Bowen. Ms. Donnell, if we could follow up. Justice, I promised you I'd be able to tell you it's on page 34. I remember it as if it was yesterday, the questioning. I really do. And I went through it, too, and I don't see it in the transcript. And it's very – Page 34. Oh, did you – That was an example. Yes. Oh, okay. That was an example. So you didn't find it in the record, either. I didn't find it. And honestly, I remember it because I – to tell you the truth, I thought, what a stand-up guy when he said it. Well, maybe the court reporter just didn't take it. Yeah, because I know Judge Pacey alludes to it also. Right. Right. It's very mysterious. Mr. Bowen talks about Mr. Dunnehy having to work long into his golden years in order to keep paying this. I would note that he does have the $1.1, $1.2 million in non-marital assets, which at the time he's ready to retire, I mean, he could share crop with someone else. He could sell farmland, and he's not required to work to his death. That $1.1 million represents farm ground? Farm ground and a little bit of – he had some – well, you saw the parties had investments. He had some investments. How many acres of farm ground? 240. 120. 120. Sorry. He has 240. I know. Yeah. It's 120. 120? Yeah. Okay. Of non-marital farm land. Yeah. So you're saying he could get $250 in cash for it for that? He could, or he could sell it for whatever farm land is currently going for, which – I don't have a crystal ball, but at the time when we did this trial, farm land was quite expensive. So you don't have an opinion on whether it's going to continue to increase in value? I believe it will. And I would note, if you look at the transcript, and this is what is in the transcript, is there were crops in the ground from 2011 that had not been sold yet. It was 115,000, I believe, that were claimed at the time of court. Continuing our subpoenas after trial, because it was 318, and again, that's a net figure. And that was done – we received that after trial. So that wasn't before the trial? It wasn't before the trial, but it was last year's corn that wasn't sold until later. And again, we hear a lot of poor Mr. Donaghy, and I respect Mr. Donaghy, but the maintenance is deductible to him, so given his income, that will be a benefit for him. Any other questions? Thank you. We'll take this matter under advisement and stand at recess. Thank you.